# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **MICHAEL ASHFORD** | : | **CIVIL ACTION NO. 19-cv-610** |
| | | **c/w 14-cv-983, 14-cv-984,** |
| | : | **14-cv-985, 14-cv-986, 14-cv-987,** |
| | | **14-cv-988, 14-cv-989, 14-cv-990,** |
| | : | **14-cv-991, 14-cv-992, 14-cv-2323,** |
| **VERSUS** | | **14-cv-2324, 14-cv-2325, and** |
| | : | **14-cv-2538** |
| | : | **JUDGE WALTER** |
| **AEROFRAME SERVICES, LLC, ET AL.** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Currently pending before us is a Motion for Summary Judgment filed by Aviation Technical Services, Inc. ("ATS"), seeking dismissal of all claims pending against it by the parties whose claims have been consolidated into this docket number.  Doc. 92.  The claims sought to be dismissed were brought by over 100 former employees ("plaintiff-employees") of Aeroframe Services, LLC, ("Aeroframe"), Aeroframe itself, and Aeroframe principal and CEO Roger Porter ("Porter").[1]  We refer to the employees, Aeroframe, and Porter collectively as the "non-ATS litigants."  ATS also asks us to dismiss the claims of the plaintiff-employees against Aeroframe.

---

[1] Although we did not do so initially, we have since determined Aeroframe to be simply the alter-ego of Porter.  In our first dealings with remand in *Ashford 1*, 14-cv-992, ATS encouraged us to conclude that Porter and Aeroframe were one in the same but we declined to do so, in part because Aeroframe was being represented by a seemingly random, unattached law firm—the Williams firm. See 14-cv-992, doc. 45, p. 16, n. 19.  By the time we reconsidered remand in this case and reviewed the additional information obtained by ATS while preparing for its Motion for Sanctions in *Ashford 1*, we had no difficulty concluding "there is no daylight between Porter and Aeroframe." Doc. 62, p. 7.  By that time we learned that the relationship between the Williams firm and Thomas Filo, an attorney whose involvement is discussed more fully below, was so intertwined that "Williams found it necessary to have Porter, acting for Aeroframe, waive any conflict inherent in the representation." Doc. 62, p. 12.  Comparison of the oppositions to this motion filed by Aeroframe to that of Porter [docs. 98 and 97] —they are virtually identical, word-for-word— further buttresses our conclusion.  And then there is the near lock-step manner in which they have participated in this litigation as illustrated below.  "[T]here is no daylight between Porter and Aeroframe." *Id.* at p. 7.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this court. After consideration of the memoranda in support and in opposition of the motion, the evidence submitted therewith (or not), and for reasons stated below,

**IT IS RECOMMENDED** that the motion be **GRANTED** and that judgment be rendered in favor of ATS against all non-ATS litigants, dismissing all claims against ATS, costs to be assessed to the non-ATS litigants**.** Further, we **RECOMMEND** the court **DENY** ATS's request to grant summary judgment in favor of Aeroframe against the plaintiff-employees.

Finally, we **RECOMMEND** the district court **RECONSIDER** its previous ruling in *Ashford 1* mooting the Motion for Summary Judgment filed there by Ashford against Aeroframe. 14-cv-992 motion at doc. 85, ruling at doc. 104. We now recommend that the motion be granted and judgment be rendered in favor of Ashford and against Aeroframe, awarding Ashford his wages, penalties, and attorney fees as prayed for against his former employer.

**I.**
**BACKGROUND**

**A. General**

In the Fall of 2013 and the beginning of 2014, attorney Somer Brown ("Brown") with the law firm of Cox, Cox, Filo, Camel & Wilson ("the Cox firm"), filed ten separate lawsuits in four parishes, all of which were removed to this court on May 14, 2014.[2] All complaints of all plaintiff-

---

[2] 14-cv-983 (Warner from Cameron Parish) at doc. 1; 14-cv-984 (Adams from Calcasieu Parish) at doc. 1; 14-cv-985 (Boring from Calcasieu Parish) at doc. 1; 14-cv-986 (Cleaves from Calcasieu Parish) at doc. 1; 14-cv-987 (Cooley from Calcasieu Parish) at doc. 1; 14-cv-988 (Gallow from Calcasieu Parish) at doc. 1; 14-cv-989 (Decolongon from Calcasieu Parish) at doc. 1; 14-cv-990 (Blanton from Calcasieu Parish) at doc. 1; 14-cv-991 (Rackard from Beauregard Parish) at doc. 1; and 14-cv-992 (*Ashford 1* from Evangeline Parish) at doc. 1. We refer to these as "the first filed claims."

employees in all suits, including those filed and removed later, were identical.[3]  ATS's motion under consideration seeks to dismiss claims against it by all employees asserted in the cases that are now consolidated.

We have twice provided extensive procedural histories of the controversies between these litigants, first in a Report and Recommendation issued in Ashford vs. Aeroframe Services, LLC, et. al., docket number 14-cv-992 ("*Ashford 1*") [doc. 283, adopted by the district court at doc. 294] wherein we recommended sanctions be imposed against non-ATS litigants Aeroframe and Porter and attorneys Brown and Thomas A. Filo ("Filo"), both partners in the Cox Firm and again in this case ("*Ashford 2*") in a Report and Recommendation recommending denial of a Motion to Remand filed by non-ATS litigants.  *See* doc. 62, Report and Recommendation, adopted by the district court at doc. 69.  Virtually all filings, memoranda, and hearings in this matter to date have focused solely on jurisdiction and sanctions.  We now focus on the background of the case(s) from a substantive standpoint.

## B.  The First Filed Lawsuits

Plaintiffs-employees' claims against Aeroframe are for wages, penalties, and attorney fees due under the Louisiana "Last Paycheck Law." La. R.S. § 23:631.  Each plaintiff-employee claims he or she was terminated from employment with Aeroframe when it closed its door on August 9, 2013.  Each plaintiff claims that Aeroframe failed to pay his or her last wages and that they are owed those wages in addition to penalties and attorney fees.  The particulars of plaintiff-employee complaints against ATS are discussed below but they seek damages under La. C.C. art. 2315,

---

[3] Of the other four consolidated cases, three were removed 7/16/14 and the last was removed 8/20/14.  They are 14-cv-2323 (Morvant from Jefferson Davis Parish), 14-cv-2324 (Coley from Calcasieu Parish), 14-cv-2325 (Cogdill from Calcasieu Parish), and 14-cv-2538 (Barreda from Calcasieu Parish).  We refer to these as "the latter removed cases."

Interference with Contract, and the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et. seq.*

### C. ATS Response to Plaintiff-Employee Claims

ATS answered all "first-filed" claims in December of 2013 and then, in March of 2014 and in most of those cases, filed a cross-claim against Aeroframe and a Third Party Demand against Porter.[4]  Unsurprisingly, ATS's version of events, discussed more fully below, did not wholly comport with those set forth by the non-ATS litigants.  ATS sought its own damages from Aeroframe and Porter for expenses incurred in their business dealings and it sought indemnity for plaintiffs' claims and damages from ATS and Porter under the theory of unjust enrichment.[5]

### D. Progress of *Cooley v. Aeroframe*

Not much occurred in any of the state court proceedings except *Cooley v. Aeroframe*,[6] the very first case filed on September 24, 2013, in Calcasieu Parish, Louisiana. Brown, on behalf of her *Cooley* clients, issued a notice of corporate deposition to be held in Lake Charles, Louisiana.[7] ATS moved for a protective order as Porter had yet to respond to its demand against him and because the deposition should be held at its corporate office in Seattle, Washington.[8]  From the records available, it appears a conference was had with the state district court and ATS was successful in arguing the inappropriateness of having Washington-based witnesses compelled to

---

[4] *See* 14-cv-983 (Warner) at doc. 1, att. 1, p. 19; 14-cv-984 (Adams) at doc. 1, att. 1, p. 24; 14-cv-985 (Boring) at doc. 1, att. 1, p. 24; 14-cv-986 (Cleaves) at doc. 1, att. 1, p. 25; 14-cv-987 (Cooley) at doc. 1, att. 1, p. 89; 14-cv-988 (Gallow) at doc. 1, att. 1, p. 12; 14-cv-989 (Decolongon) at doc. 11; 14-cv-991 (Rackard) at doc. 3, p. 42; and 14-cv-992 (Ashford) at doc. 1, att. 1, p. 41.  For whatever reason no similar pleading was filed in 14-cv-990 (Blanton). ATS's cross-claim and third party demand in *Ashford 1* is found in this proceeding, *Ashford 2*, at doc. 1, att. 12, p. 41.
[5] Those claims will remain even in the event the district court adopts this Report and Recommendation.
[6] 14-cv-987.
[7] 14-cv-987 (Cooley), doc. 1, att. 1, p. 25.
[8] 14-cv-987 (Cooley), doc. 1, att. 1, p. 30.

appear in Louisiana for depositions as, two days following the conference, plaintiffs issued an amended notice for the depositions to be held in Seattle on March 26, 2014.[9]

Those depositions took place as scheduled.[10]   Review of the depositions indicates that Filo, partner of Brown, who, as of that time, had not enrolled as counsel for anyone, conducted the entirety of the questioning for all non-ATS litigants.  We are unaware of any substantive, merit-based discovery done after this date directed to ATS.[11]

### D.  Porter's Reconventional Demand and Aeroframe's Incidental Demand in *Ashford 1*; Porter and Aeroframe's Responses to ATS's Claims in All Cases Other Than *Ashford 1.*

Porter filed a reconventional demand against ATS and Aeroframe filed an incidental demand against ATS, both pleadings being filed only in *Ashford 1*, not in *Cooley* (in which the Seattle depositions had been noticed) or any other first filed case.  Doc. 1, att. 12, p. 101 (Porter reconventional demand) and doc. 1, att. 12, p. 116 (Aeroframe incidental demand).  In almost all

---

[9] 14-cv-987 (Cooley), doc. 1, att. 1, p. 140.

[10] See Doc. 25, att. 1, pp. 21, 273.

[11] On 3/2/21, as we were preparing this Report and Recommendation, Aeroframe sought leave to conduct discovery against ATS relative to the wage claims of the plaintiff employees, claims that do not involve ATS.  Aeroframe's request was prompted by an order we issued to the *Cooley* plaintiff-employees to seek summary judgment for their claims or risk our issuance of a Report and Recommendation that the claims be dismissed for failure to prosecute. Doc. 104.  Although we did not believe Aeroframe needed our permission to conduct discovery, we did allow it to proceed but not against ATS as it is a stranger to those claims.  Aeroframe wanted ATS to produce its (Aeroframe's) records at ATS's bother and expense so that it (Aeroframe) could defend itself against the motions for summary judgment filed as ordered by the *Cooley* plaintiff-employees.  We ruled that Aeroframe, at its own expense, could obtain copies of the hard drives from its computers now in possession of a third-party custodian, at which point it would have a copy of all its records.  *See generally* docs. 109, 110.  Aeroframe chose to not obtain its records as suggested.  14-cv-987 (*Cooley*), doc. 80.  Instead it chose to use this directive to claim its "shock and dismay" that we **denied** its request for discovery, which, clearly, we did not.  *Id.* p. 5.  It is precisely this type of "professional impropriety and shenanigans" [*Ashford v. Aeroframe Services, LLC*, 907 F.2d 385, 398 (5th Cir. 2018) (Jones, J., dissenting)] that led to our previous recommendation and the district court's acceptance of that recommendation for imposition of sanctions against Brown, Aeroframe, Filo, and Porter.  14-cv-992 (*Ashford 1*), docs. 283 (R&R) and 294 (order adopting R&R).  We denied ATS's request to sanction Aeroframe's original counsel, Joseph P. Williams, Sr., and Richard B Williams, whose firm's involvement is discussed in fn. 1, finding their participation in this scheme to be regrettable but further finding that they did attempt to withdraw after receiving correspondence from ATS forwarding information from the Tennessee litigation (fn. 36) evidencing Porter's duplicity.   "Shock" and "dismay" must be in the Porter/Aeroframe lexicon as those were the exact adjectives used by Porder in his declaration signed four years ago when describing his reaction upon learning that ATS had purchased the EADS note.  Doc. 97, att. 4, p. 3, ¶

other cases where ATS made claims against Aeroframe and Porter, Aeroframe and Porter, in tandem, filed exceptions of prematurity and *lis pendens*, arguing that in each of those proceedings ATS's claim was premature as it was filed without leave of court and after ATS had filed its answer, and additionally that ATS's claim was subject to issue preclusion because ATS had made the exact same claim in *Ashford 1*.  *Id.*[12]  Neither Porter nor Aeroframe excepted to the prematurity of ATS's claim in *Ashford 1*, suggesting (as ATS does suggest) the non-ATS litigants preferred the case coming out of Evangeline Parish.[13]

Porter's reconventional demand was very sophisticated for a lay person.[14]  14-cv-992, doc. 1, at t. 1, p. 101.[15]  The allegations of his demand are discussed more fully below but he sought damages from ATS for intentional or tortious interference with his employment agreement with

---

[12] See identical exceptions filed by Aeroframe and Porter in 14-cv-984 (Adams) at doc. 1, at t. 1, pps. 63 (Porter) and 68 (Aeroframe); 14-cv-985 (Boring) at doc. 1, at t. 1., p. 65 (Porter – if Aeroframe filed one in this matter before removal it was not contained in the record); 14-cv-987 (Cooley), doc. 1, at t. 1, pp. 147 (Aeroframe) and 160 (Porter); 14-cv-988 (Gallow), doc. 1, at t. 1, pps. 64 (Porter) and 67 (Aeroframe).

[13] The first "first filed claims" (see fn 2) were removed on 5/14/14.  The next three were removed 7/16/14.  See 14-cv-2323 (Morvant) at doc. 1; 14-cv-2324 (Coley) at doc. 1; and 14-cv-2325 (Cogdill) at doc. 1.  The Notices of Removal in the latter removed cases point out what we highlight here, i.e. that, prior to the removal of the first filed claims, only *Cooley* saw any action.  In these later removal notices, ATS suggests that the non-ATS litigants learned in *Cooley* that they would not be given their way when the state district court would not allow them to go forward with corporate depositions of ATS in Calcasieu Parish, Louisiana, as they had wanted.  So, according to ATS, they chose a different horse with which to go forward, namely *Ashford* coming from Evangeline.  See 14-cv-2323 (Morvant) at doc. 1, pp. 17-18, ¶¶ 43-44; 14-cv-2324 (Coley), at doc. 1, pp. 17-18, ¶¶ 43-44; and 14-cv-2325 (Cogdill) at doc. 1, pp. 17-18, ¶¶ 43-44.  This is a compelling observation that, when considering how much effort has been spent by the non-ATS litigants to get out of this court and how little has been spent by them on the merits of their claims or defenses, does support conclusions reached elsewhere by this court and Judge Jones in her dissent in *Ashford v Aeroframe Services, LLC*, 907 F.3d 385 (5th Cir. 2018), that this has been one huge exercise in forum shopping by these non-ATS litigants in search of a friendly court in which their meritless claims against ATS might find purchase.

[14] Porter did not write that pleading himself.  It was written for him by Filo.  See *Ashford 1*, 14-cv-992, doc. 260 (testimony at hearing on Motion for Sanctions), p. 30 (transcript p. 189) where Filo admits he drafted Porter's reconventional demand as well as Porter's exceptions discussed above.  Those were filed 4/7/14.  Brown did not seek a waiver of conflict from the employee-plaintiffs until her now infamous email sent 4/19/14.  Doc. 46, at t. 40.  Given our conclusion in this proceeding that plaintiff-employees and Porter were aligned before these suits were filed (see Report and Recommendation at doc. 62, adopted by the district court at doc. 69), this fact is of no moment.  This fact also supports our conclusion in this proceeding that plaintiff-employees and Porter were aligned before these suits were filed.

[15] Found in this record at Doc. 1, at t. 12, p. 101.  Further citation to that complaint will be to where it is found in this record.

AAR Corporation ("AAR") [*Id.* at p. 108] and Unfair Trade Practices under La. R.S. 51:1401, *et. seq.* [*Id.* at p. 109].

Aeroframe filed its Answer to Original Petition, Answer to Cross-Claim of Aviation Technical Services, Inc., and Cross-Claim by Aeroframe Services, Inc., on April 8, 2014, also in *Ashford 1*. 14-cv-992, doc. 1, att. 1, p. 116.[16] The factual allegations made by Aeroframe were nearly identical to those made by Porter in his claim against ATS, not surprising given the fact the latter is the alter-ego of the former,[17] and sought damages for Breach of Contract, violation of LUFTA, and "Intentional and/or Tortious Interference with a Contract and/or Business Relationship." *Id.* at p. 127.

### E. Progress of *Ashford 1*

Considering the decision of Porter and Aeroframe to answer and assert claims only in *Ashford 1* and in no other, they obviously chose *Ashford 1* from Evangeline Parish to act as the "bellwether."[18] We laboriously detail in our Report and Recommendation issued in this matter at document 62 the process by which the Motions to Remand were denied in *Ashford 1*, all claims on the merits against ATS by all parties were dismissed on summary judgment, how the non-ATS litigants appealed focusing entirely on the jurisdictional issue, how the Fifth Circuit reversed our finding on jurisdiction, and how ATS removed again after discovering a plethora of other evidence to establish that the non-ATS litigants had in fact been aligned in this litigation since its inception and further noting that the ruling of the Fifth Circuit might well have been different had that court known of the existence of an agreement that Porter and Aeroframe had entered to fund the employees' unpaid wage claims from proceeds received by Aeroframe or Porter (who are one in

---

[16] Found in this record at Doc. 1, att. 12, p. 116.  Further citation to that complaint will be to where it is found in this record.
[17] See fn. 1.
[18] See fn. 13.

the same) in the event either recovered from ATS.  Doc. 62, pp. 2-11.  Through that Report and Recommendation, we suggested to the district court that it deny Motions to Remand filed by non-ATS litigants and the district court adopted the recommendation.  Doc. 69.

### F. Consolidation of All Claims and the Current ATS Motion for Summary Judgment

After having concluded in *Ashford 1* that we had jurisdiction, then after the claims against ATS were dismissed in *Ashford 1* on Motion for Summary Judgment, then after remand following a conclusion by the Fifth Circuit that we lacked subject matter jurisdiction,[19] then after re-removal of Ashford to this docket number *(Ashford 2)* and our conclusion again that we did have subject matter jurisdiction, we were finally in a position of getting as many plaintiff-employee cases as possible in the same procedural posture as *Ashford 2* so that we could finally address the merits (or lack thereof) and have this litigation finally completed.

In each non-*Ashford* case there was pending a Motion to Remand filed by each non-ATS defendant and in each case ATS had filed a Motion for Summary Judgment.[20]  In each case we recommended that the district court adopt our conclusion as to subject matter jurisdiction issued in this matter and in each case the district court agreed.[21]  Thereafter we issued a Memorandum Ruling granting ATS's Motion to Consolidate[22] and terminated all dispositive motions pending in

---

[19] *Ashford v Aeroframe Services, LLC*, 907 F.3d 385 (5th Cir. 2018),

[20] Some cases also had pending Motions to Dismiss for Lack of Subject Matter Jurisdiction but none raised any issue that was not raised in a Motion to Remand.

[21] *See* 14-cv-983 (R&R at doc. 73, adopted by district court at doc. 79); 14-cv-984 (R&R at doc. 64, adopted by district court at doc. 70); 14-cv-985 (R&R at doc. 64, adopted by district court at doc. 70); 14-cv-986 (R&R at doc. 67, adopted by district court at doc. 74); 14-cv-987 (R&R at doc. 64, adopted by district court at doc. 72); 14-cv-988 (R&R at doc. 64, adopted by district court at doc. 69); 14-cv-989 (R&R at doc. 56, adopted by district court at doc. 63); 14-cv-990 (R&R at doc. 54, adopted by district court at doc. 61); 14-cv-991 (R&R at doc. 63, adopted by district court at doc. 68); 14-cv-2323 (R&R at doc. 49, adopted by district court at doc. 56); 14-cv-2324 (R&R at doc. 50, adopted by district court at doc. 58); 14-cv-2325 (R&R at doc. 50, adopted by district court at doc. 58); and 14-cv-2538 (R&R at doc. 63, adopted by district court at doc. 70).

[22] We did not consolidate 16-cv-1512, *Day v Aeroframe*, finding that it was not in the same procedural posture as the others.  Neither did we consolidate 16-cv-1378, *Neathammer v Aeroframe*, or 16-cv-1397, *Jackson v Aviation Technical Services*.  Although the latter two cases involved the same circumstances, plaintiffs in both cases were represented by counsel other than Somer Brown or the Cox firm.  In both of those cases plaintiffs settled with defendants; however, in both cases either Aeroframe, Porter, or both continue to argue that litigation remains viable

all consolidated cases but urging the parties to refile (if they deemed that action appropriate) in this lead case.

Which brings us to the Motion for Summary Judgment filed by ATS currently before us. Doc. 92. This motion seeks dismissal on the merits of the claims against it by all former Aeroframe employees who are plaintiffs in all matters now consolidated as well as all claims filed against it by Aeroframe and Porter. Doc. 87.[23] Not a single claim asserted by any non-ATS litigant against ATS has been amended, supplemented, or restated.

In response to ATS's motion, we issued an electronic order that advised as follows:

> No response to this motion filed by any party is to contain any argument as to this court's subject matter jurisdiction. Argument and evidence to support that argument is to be limited to the merits. All non-ATS litigants, by timely moving for remand, did all that was required to preserve objections to removal. *Caterpillar Inc. v. Lewis*, 519 U.S. 61; 117 S.Ct. 467, 475; 136 L.Ed.2d 437 (1996). Any further attempts to argue this court's subject matter jurisdiction will be considered a violation of this order and will be ignored.

Doc. 95. This was done to stop the endless regurgitation by non-ATS litigants of their claims that we lack subject matter jurisdiction to consider the motion—claims that they have made at every turn and in unison—and to limit them to the merits (or lack thereof) of their claims against ATS. This direct order was violated by each non-ATS litigant.[24]

---

and the cases should be remanded, ostensibly so that they can try their claims against ATS in that state court—the same claims under consideration in this Motion for Summary Judgment.

[23] Restating, the consolidated cases are docket numbers 14-cv-983 (Warner), 14-cv-984 (Adams) , 14-cv-985 (Boring), 14-cv-986 (Cleaves), 14-cv-987 (Cooley), 14-cv-988 (Gallow), 14-cv-989 (Decolongon), 14-cv-990 (Blanton), 14-cv-991 (Rackard), 14-cv-992 (Ashford 1), 14-cv-2323 (Morvant), 14-cv-2324 (Coley), 14-cv-2325 (Cogdill), and 14-cv-2538 (Barreda).

[24] Doc. 96, Plaintiffs' Opposition, p. 1, fn. 1 ("This opposition is being filed subject to Plaintiffs' ongoing objection to the subject matter jurisdiction of the federal courts"); doc. 98, Aeroframe's Opposition, p. 2, fn 1 ("Aeroframe hereby adopts and incorporates [certain pleadings] and all arguments advanced in those prior pleadings which adequately outline the lack of this Court's subject matter jurisdiction"); and Doc. 97, p. 2, fn. 1 ("Porter hereby adopts and incorporates [certain pleadings] and all of the arguments advanced in those prior pleadings which adequately outline the lack of this Court's subject matter jurisdiction.").  Such arguments are yet another example of their synchronized pleading.

## II.
### APPLICABLE LAW AND DISCUSSION OF THE CLAIMS

### A. Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 106 S. Ct. at 2511 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2110 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

When, however, a movant satisfies its burden of showing there is no genuine dispute of material fact, the nonmovant must demonstrate there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Local Rule 56.1 requires a movant to file a statement of materials facts to which it contends there is no genuine issue to be tried. In response thereto an opponent of the motion must file a separate, short, and concise statement of the material fact as to which there exists a genuine issue to be tried. W.D.La.R. 56.32. Any material fact listed by the moving party will be admitted for purposes of the motion "unless controverted as required by this rule." *Id.* A non-movant may not meet its burden of proving there does exist a genuine issue for trial by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Little*, 37 F.3d at 1075.

**B. Factual Allegations of the Non-ATS Litigants**

Because all facts for all pleadings for all claims against ATS came from Porter, we are able to summarize them collectively as follows:

1. Aeroframe closed its operation August 9, 2013, and employee-plaintiffs were not paid last owed wages.[25]

2. Before closure, Aeroframe and ATS had discussed a possible merger or buy-out.[26]

3. ATS was given access to Aeroframe's financial information.[27]

4. When ATS and Aeroframe were unable to reach a deal, Aeroframe began negotiating with AAR, a competitor of ATS.[28]

---

[25] Doc. 1, att 12, p. 105 (Ashford);
[26] Doc. 1, att 12, p. 5 (Ashford); doc. 1, att. 12, p. 125 (Aeroframe); and doc. 1, att. 12, pp. 105-106 (Porter).
[27] Doc. 1, att. 12, p. 5 (Ashford); doc. 1, att. 12, p. 125 (Aeroframe); and doc. 1, att. 12, p. 105 (Porter).
[28] Doc. 1, att. 12, p. 5 (Ashford); doc. 1, att. 12, p. 126 (Aeroframe); and doc. 1, att. 12, p. 106 (Porter).

5. While AAR and Aeroframe were negotiating, ATS purchased a debt owed by Aeroframe, the "EADS note,"[29] in order to interfere with the AAR negotiation.[30] ATS made this purchase without the permission of Aeroframe or Porter.[31]

6. ATS foreclosed on the loan to cause Aeroframe to go out of business.[32]

## C. Facts Established by the Exhibits Attached to the Motion for Summary Judgment

Through its Motion for Summary Judgment and the exhibits attached thereto, ATS paints a picture that is quite different than what the bare allegations of the non-ATS litigants suggest. What follows is a chronology of events from the summer of 2013, all supported by competent evidence:

1. The EADS note was a commercial instrument, the existence of which was public record. Doc. 92, att. 12. No one needed access to Aeroframe confidential information to know of its existence.

2. On 5/16/2013, ATS and Aeroframe entered into a Confidentiality Agreement. Doc. 92, att. 14. Nothing in that document required ATS to do or not do anything with respect to information about Aeroframe. The entire agreement was focused upon protection of ATS information.

3. Aeroframe and ATS entered into an exclusivity agreement on 6/7/2013. Doc. 92, att. 18. This agreement precluded Aeroframe from dealing with any other entity regarding acquisition of its assets for a period of 30 days.

4. Counsel for both companies spoke with Matra Aerospace, Inc. ("Matra"), the EADS successor in interest, about the purchase of the note. Doc. 92, att. 21.

5. According to Porter's declaration, the exclusivity agreement expired 7/7/2013 but Porter continued discussions with ATS about a potential deal. Doc. 97, att. 4, p. 2, ¶ 11.

6. The day after the exclusivity agreement expired, ATS COO Burnside texted Porter to get contact information for the person with Matra with whom he (Burnside) could deal about acquiring the note. Porter asked "do you want

---

[29] The EADS note was a debt owed by Aeroframe and Porter personally and was secured by the equipment used by Aeroframe at its operations at the Chennault International Airport Authority ("CIAA"). See generally the testimony of ATS COO Bret Burnside at doc. 97, atts. 5, 6.

[30] Doc. 1, att. 12, p. 5 (Ashford); doc. 1, att. 12, p. 126 (Aeroframe); and doc. 1, att. 12, p. 108 (Porter).

[31] Doc. 1, att. 12, p. 126 (Aeroframe); and doc. 1, att. 12, p. 107-108 (Porter).

[32] Doc. 1, att. 12, p. 6 (Ashford); and doc. 1, att. 12, p. 108 (Porter).

to speak directly with the EADS folks" to which Burnside replied "we need to talk with them directly about buying the note." Porter responded "Okay will pull the info." <u>Doc. 92, att</u>. 43. p. 2.[33]

7.  On 7/12/2013, Aeroframe counsel W. Joe Mize gave the green light to ATS to deal directly with EADS/Matra on acquisition of the EADS note. <u>Doc. 92, att</u>. 21.

8.  ATS continued to deal with Porter after expiration of their agreement, which continued dealings resulted in Porter signing a contract of employment with ATS on 7/31/2013. <u>Doc. 92, att</u>. 20 (emails between the parties beginning 7/10/2013 and ending 8/2/2013).

9.  Following expiration of the agreement, ATS provided consulting management services. <u>Doc. 92, att</u>. 20, p. 61. This fact is supported by Porter's declaration in which he stated that ATS was aware of Aeroframe's continuing financial decline "through personal [sic] on-site at Aeroframe's Chennault facilities" and again when he claimed to have told ATS (through Burnside) on 7/19/2013 that Aeroframe was in talks with another purchaser and that "ATS might want to pull its people who had been on-suite [sic] at Aeroframe." <u>Doc. 97, att</u>. 4, p. 2, ¶¶ 11, 16.

10. On 7/19/2013, Porter signed a Letter of Intent with AAR which included an exclusivity provision for 30 days. <u>Doc. 97, att</u>. 4, p. 2, ¶ 15.

11. As noted in 8 above, Porter continued to deal with ATS, including signing an employment contract with them on 7/31/2013, even though at that time he was obligated to deal with AAR exclusively. See emails at <u>Doc. 92, att</u>. 30.

12. According to Porter's declaration, on 7/19/2013 he immediately informed ATS's Burnside that he had located another purchaser and that "ATS might want to pull its people who had been on-suite [sic] at Aeroframe." <u>Doc. 97, att</u>. 4, p. 2, ¶ 16. Texts between the parties differ from the declaration in that the texts show clearly Porter was confronted to give this information and did not "immediately inform" ATS. On 7/19/2013 Burnside texted Porter at 5:56 p.m, "Roger, I need some sort of an answer on what course you are taking. If you are talking with other groups then I will have to pull my guys. Doesn't make much sense to keep them there if you are talking with other groups. Need and[34] answer if you don't mind. Thanks." Porter replied "I started a dialog with another company today. Advise you pull your guys and we can see if there is a need to revisit at some point." Burnside replies "very disappointing considering how much help we have

---

[33] These texts markedly conflict with Porter's declaration that he was "shocked and dismayed" to learn ATS had purchased the note. <u>Doc. 97, att</u>. 4, p. 3, ¶ 24.
[34] We are not inserting "sic" notations at all obvious errors in informal text writings.

given you over the last 6 weeks.  It would be very nice of you called and at least have me some explanation.  Thanks." Doc. 92, att. 43, p. 3.[35]

13. On 7/20/2013, while the AAR exclusivity agreement was still in place, Porter agreed to meet with Matt Yerbick, President and CEO of ATS, about an employment agreement.  Doc. 92, att. 20, p. 43.

14. It was not until 7/22/2013 that Porter confirmed to ATS's Burnside that he (Porter) was under an exclusivity agreement with AAR, and only did so after Burnside asked him directly whether he was.  Doc. 92, att. 43, p. 4.

15. On 7/23/2013 ATS agreed to purchase the EADS note.  Doc. 97, att. 4, p. 3, ¶ 19.

16. On Saturday, 7/27/2013, while Porter was under the AAR exclusivity agreement, he played golf with ATS's Burnside.  Porter claimed it was during this time he informed Burnside that AAR was the purchaser of Aeroframe.  Doc. 97, att. 4, p. 3, ¶ 23.

17. As of 7/31/2013, AAR knew of ATS's acquisition of the EADS note.  Doc. 92, att. 41.  On that date David Storch with AAR sent an intra-office email: "Just spoke to Dany.  Please speak with EADS to confirm if they sold the note to ATS.  We should peruse [sic] the airport lease with Roger's support (if possible).  If successful on lease, we should go into the market for tooling and equipment and give ATS 7 days to get their equipment out of the hangers." *Id.*

18. Porter was offered employment with ATS on 7/31/2013 via email sent at 1:32 p.m.  Doc. 92, att. 20, p. 48.  Porter accepted ATS's offer.  Doc. 97, att. 4.

19. On 7/31/2013, Laffy Avery, president of CIAA, met with representatives of AAR and Porter to discuss AAR getting Aeroframe's hangar lease at CIAA even though the Aeroframe assets were no longer available since ATS acquired the EADS note for which the equipment stood as collateral.  Doc. 92, att. 38, p. 4.  Avery stated that it was his understanding "that AAR representatives and Porter would be meeting to see if they could reach an agreement for Porter to become an employee of AAR.  I relied on and trusted Porter's judgment as to whether it would be best for CIAA to award

---

[35] Whether Porter told ATS first or ATS only learned when it confronted Porter creates no genuine issue for trial as it does not matter.  If we were asked or able to make a credibility call on that fact, however, which we are not, the call would not be in favor of Porter's declaration.  We would characterize this as yet another attempt by Porter to bestow upon himself an aura of goodliness and deflect from his perfidy.  We would place that statement in the same category as we would his other declaration that, "[a]t no time did I ever play ATS against AAR or AAR against ATS." Doc. 97, att. 4, p. 4.  Our conclusion as to Porter's incredibility would be bolstered by his text to ATS discussed at II.C.21 when he promised he was "on the ATS team" about ATS getting the CIAA lease while he had already met with AAR and CIAA to arrange AAR getting the lease.  See discussion at II.C.19.

the lease to AAR (as opposed to ATS) because I trusted Roger Porter and considered him to be an expert on MROs." *Id.*

20. While Porter was working with AAR on 7/31/2013 so that it, AAR, could obtain the CIAA lease and while still obligated by the exclusivity agreement with AAR, Porter emailed ATS CEO Yerbic and said "I have the agreement [employment contract] but couldn't scan it at the office so will send from home tonight. Trying to keep it very quiet. [No kidding]. My thoughts regarding ATS on site as quick as possible would be to come back in as a production consultants. Your thoughts." Doc. 92, att. 20, p. 48.

21. At 11:38 a.m. on 8/1/2013, ATS's Burnside texted Porter asking if he had any communication with AAR to which Porter replied he "missed call from Chris Jessup" Doc. 92, att. 36, p. 2. We must assume that Porter forgot he had met the day before with AAR and CIAA. When Burnside asked Porter to keep him "in the loop," Porter responded "***Okay will do. I give you my word that I am on the ATS team and will keep you in the loop.***" *Id.*

22. At 1:32 p.m. the same day, Burnside texted "[t]he rumor mill is AAR is in LC talking to Chenault about hangar leases. Can you check it out?" to which Porter replies "Going over there now." Doc. 92, att. 36, p. 2. In those same texts, ATS asked for particulars on the CIAA lease.

23. On 8/1/2013, Porter met with CIAA and AAR officials "and discussed an employment contract with AAR" (even though the day before he had signed one with ATS) "as well as an agreement to voluntarily relinquish Aeroframe's leases so that Chennault could enter into lease agreements with AAR. I learned at the meeting that AAR was planning on bringing in their own agreement. . . . That night I had dinner with AAR officials and signed an offer of employment with AAR." Doc. 97, att. 4., p. 4, ¶ 27. This would be the day after Porter signed an employment contract with ATS and gave ATS's Burnside "his word" that he was "on the ATS team."

24. On 8/2/2013 CIAA President Avery learned that AAR had reached an employment agreement with Porter so he called an Emergency Meeting of the CIAA Board of Commissioners to be held the following day to accept surrender of the lease from Aeroframe and award it to AAR. Doc. 92, att. 38, p. 4.

25. Porter attended the CIAA meeting on Saturday, 8/3/13 at 9:30 a.m. Doc. 92, att. 46, p. 3.

26. Porter testified via affidavit in a proceeding filed in Tennessee against AAR[36] that, as a result of his having reached an employment agreement

---

[36] *Porter v. AAR Aircraft Servs., Inc.*, No. 2:15-cv-02780, United States District Court for the Western District of Tennessee. The subject of this suit was the breakdown of Porter's employment agreement with AAR.

with AAR, he "recommended that the CIAA award the lease to AAR." Doc. 92, att. 30, p. 7, ¶ 12.

27. Texts between Porter and ATS's Burnside during this period (from 8/1/13 to 8/3/13) indicate ATS continued to work toward an agreement to take over the lease with CIAA. Doc. 92, att. 37.

28. On 8/4/2013 at 5:00 p.m., Porter emailed Burnside: "Bret, I was informed today via email that AAR had secured the lease at Chennault[37] and they are requesting I remove all aeroframe [sic] assets over the next two weeks. AAR had also informed me they will be on site with HR personnel to take application and make job offers. They have requested that work with them to transition the facility. I have confirmed the lease changes with the CIAA. I am going to talk to my attorney in the morning about next moves for Aeroframe and me personally. Lets [sic] have a call in the morning to discuss. So we can Manage ATS's position as it will be a factor in how I handle Aeroframe. Roger" Doc. 92, att. 34.

29. Even after being informed that AAR had the lease, ATS continued to meet with Porter. Doc. 92, att. 43, pp. 6-7. When asked to meet with Burnside, Porter responded "AAR has requested you not to come to the facility so lets meet off site." *Id.*, p. 6.

30. ATS sent formal notice of default to Aeroframe on 8/6/2013. Doc. 92, att. 31. According to Donald Cook, ATS's CFO, this notice was prompted by AAR's "request" to Porter on 8/4/2021 (see II.C.28 above) that "all Aeroframe assets [be moved] over the next two weeks." Doc. 92, att. 2, p. 5, ¶ 32.

31. Texts between Porter and Burnside between 8/5/2013 and 8/12/2013 indicate Burnside was pushing Porter to finalize an agreement. The texts do not specify about which agreement they were speaking but context tells us it was the Strict Foreclosure Agreement discussed at II.C.38 below. As we note below, the purpose of that agreement was to confer title to the equipment located at the former Aeroframe facility to ATS so that ATS could have the equipment removed from the CIAA facility. Doc. 92, att. 43, p. 8.

32. On 8/8/13, Burnside asked Porter how he is "coming on the doc's" (again, the Strict Foreclosure Agreement) and attempted to arrange a meeting between the two of them. Porter responded at 3:55 p.m. that it was unclear when they could meet as he was "***in the middle of shutting down operations***." Doc. 92, att. 43, p. 8 (emphasis added).

---

[37] Perfidy and passivity. He did not "learn that" CIAA awarded the lease to AAR on 8/4/2013—he learned 8/3/2013 at the meeting that accomplished that purpose at his suggestion. He had known it was going to happen since 8/1/2013, when he met with CIAA and AAR officials. This was his plan, his design. See II.C.23-26 above.

**33.** On 8/9/2013, Aeroframe's operations ceased.  According to Porter the closure was due to "lack of funds to pay payroll . . . as well as the imminent foreclosure of the equipment by ATS (which equipment was necessary to perform any work in progress being conducted at Chennault)."  Doc. 97, att. 4, p. 4, ¶ 32.

**34.** As early as 8/10/13, AAR's interest in having Porter on board was beginning to wane.  On that date, AAR operative David Storch wrote to others:

> Two reasons why Roger [Porter] cannot go into an operating position at our new business in Lake Charles:
>
> 1.      He has committed the most grievous of business leadership/ownership mistakes by missing at least two payrolls.  This will totally diminish employee trust, confidence and therefore his leadership effectiveness.
>
> 2.      He blames his failure on his customers FedEx and ILFC.  We can't afford to have a leader who blames his customers for his failure.  In my brief conversations I did not hear him take ownership for his failure.  I only want leaders who take ownership.

Doc. 92, att. 39, p. 2.  To this, AAR operative Chris Jessup replied "Dany and I are in full agreement with your talking points.  Roger will not be engaged with AAR until he is fully wrapped up with his obligations with Aeroframe."  *Id.*

**35.** On 8/11/2013, Burnside texted Porter at 11:12 a.m,"[s]ounds like you have now ceased operations.  I just need to know if you are going to sign the [Strict Foreclosure Agreement] or not.  Thanks."  Doc. 92, att. 43, p. 9.  Porter did not respond until the next morning at 9:21 a.m. when he said "[s]orry for try [sic] delays.  Chris [Jessup with AAR] will touch base with you as well" then later stated "[j]ust talked with Chris and all is good to do inventory."  *Id.*

**36.** On 8/14/2013, AAR sent formal demand to Aeroframe to "**IMMEDIATELY MAKE ARRANGEMENTS WITH AAR TO REMOVE OR OTHERWISE DISPOSE OF ANY PROPERTY THAT YOU OWN . . . THAT IS LOCATED ON THE PREMISES**" or risk having that property deemed abandoned.  Doc. 92, att. 32, p. 2 (emphasis in original).  That property would be the assets that acted as security for the EADS note, the equipment located at the former Aeroframe facility.  Doc. 92, att. 2, p. 5, ¶ 33.

**37.** On 8/15/2013, ATS sent an acceleration letter to Aeroframe.  Doc. 92, att. 33.  According to ATS CFO Cook, this was "a necessary step to obtain legal title to the assets secured by the [EADS] note …. so as to facilitate the AAR

demands" to remove the assets from the premises. <u>Doc. 92, at</u>t. 2, ¶¶ 34, 35.

38. On 8/20/2013, Porter, on behalf of Aeroframe, signed a Strict Foreclosure Agreement ("SFA") transferring title of the assets to ATS. <u>Doc. 92, at</u>t. 17. The SFA provides that, as of its date, Aeroframe had failed to make payments since 4/8/11 and that the accelerated amount due at that time was $9,775,500.00 plus accrued interested in the amount of $89,670.11. *Id.*, pp. 2-3. Through this agreement ATS received title to Aeroframe equipment that served as collateral for the note.

39. The SFA also contained the following waiver and release of claims by Aeroframe:

> Effective upon the date hereof, Aeroframe hereby (a) irrevocably and unconditionally releases and forever discharges ATS . . . from any and all rights, claims, remedies and causes of action related to the Note, Security Agreement and Note Purchase Agreement, and the transfer of the Transferred Collateral under this Agreement . . . and (b) covenants not to sue . . . on account of any Released Claims.
>
> . . .
>
> This agreement has been jointly drafted by ATS and Aeroframe and both parties have had access to and the opportunity to consult with independent legal counsel. This Agreement shall not be construed in favor or against any party based on draftsmanship. Both of the Parties acknowledge having read all of the terms of this Agreement and they enter into the Agreement voluntarily and without duress.

<u>Doc. 92, at</u>t. 17, pp. 6-7, 8, ¶¶ 8, 17.

The above-outlined evidence ATS submitted with its Motion for Summary Judgment meets ATS's initial burden of adducing evidence demonstrating a lack of a genuine issue of material fact. As such, the burden shifts to the non-ATS litigants to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, <u>106 S. Ct. at 251</u>. No non-ATS litigant has produced any evidence that creates a question of fact for any juror to try.

**D. Appropriateness of Summary Judgment for Each Claim of the non-ATS Litigants**

**1. Claims of the Plaintiff-Employees**

As part of their response to the motion, plaintiff-employees "incorporate fully herein by reference" pleadings filed in the consolidated cases. Doc. 96, p. 2, fn. 2. We decline the invitation to cull through those documents to determine whether any information found therein might pertain to the issues raised in the motion under consideration.

**a. Claims for Damages Pursuant to Louisiana Civil Code Article 2315**

Article 2315 of the *Louisiana Civil Code* provides "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The elements of a cause of action under article 2315 are fault, causation and damage. *Seals v. Morris*, 410 So.2d 715, 718 (La. 1981). On the element of duty:

> The existence of a legal duty coupled with a breach of that duty are prerequisites to any determination of fault. Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case and the relationship of the parties. In all cases, duty can be stated generally as the obligation to conform to the standard of conduct of a reasonable man under like circumstances.

*Id.* As has been stated by the Louisiana Supreme Court:

> In order to determine whether a plaintiff should prevail on a claim in negligence, Louisiana courts employ a duty-risk analysis. *Perkins v. Entergy Corp.,* 00–1372, (La.3/23/01), 782 So.2d 606. A duty-risk analysis involves five elements which must be proved by the plaintiff: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).

*Long v. State ex rel. Dep't of Transp. & Dev.*, 916 So.2d 87, 101 (La. 2005) (citations omitted).

The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty.

*Meany v. Meany*, 639 So.2d 229, 233 (La. 1994).  Under Louisiana law, determining the scope of a duty is "ultimately a question of policy as to whether the particular risk falls within the scope of the duty."    *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991).  In deciding whether to impose a duty in a particular case, Louisiana courts examine "whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty."  *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (quoting *Faucheaux v. Terrebonne Consol. Gov't,* 615 So.2d 289, 292 (La. 1993)).

Plaintiff-employees' petitions fail to allege a single duty owed to them by ATS, much less how that duty was breached or how any breach of duty caused them any harm.  Plaintiff-employees fail to even mention La. C.C.P. article 2315 in their opposition to the motion.  Doc. 96.  Plaintiff-employees state nothing in their Statement of Contested Facts that would, in any manner, establish any duty owed to them by ATS, how any duty owed to them was breached, or how any breach caused them damages.  Doc. 96, att. 1.[38]  They merely complain that ATS "exploit[ed] the confidential financial situation of Aeroframe and retaliate[ed] against Aeroframe by accelerating large amounts of debt so quickly that Aeroframe was forced to shut down its operations without paying its employees for work performed and wages due."  Doc. 92, att. 3, p. 4, ¶ 16.  Plaintiff-employees failed to supply any law (statutory, jurisprudential, or arising from general principles of fault) that would support a claim that ATS owed them any duty at all with respect to its dealings with Aeroframe.

We recommend that the complaint of the plaintiff-employees against ATS for damages under La. C.C. art. 2315 be dismissed with prejudice.

---

[38] In their Statement of Contested Facts, plaintiff-employees state "[p]laintiffs have requested additional time [to conduct discovery in response to ATS's motion] and "will supplement his [sic] filing if the Court permits time for discovery." Doc. 96, att. 1.  Nowhere in the record will one find a request by plaintiff-employees for additional time to conduct discovery.

**b. Claims for Damages for Intentional Interference with Contract between Aeroframe and AAR and Plaintiffs' Employment Contract with Aeroframe.**

Plaintiff-employees allege that "ATS's actions constituted an intentional interference with both the contract between Aeroframe and AAR and Plaintiff's employment contracts with Aeroframe." Doc. 1, att. 12, p. 6. They state that "AAR caused Aeroframe's breach of that portion of the implicit employment contract whereby Aeroframe owed wages to Plaintiff[s] for work that had already been fully performed by Plaintiff[s]." *Id.* at p. 7. According to plaintiff-employees' complaint, "ATS's actions in accelerating the debt of Aeroframe were done with the knowledge that it would force Aeroframe's closure rendered impossible performance by Aeroframe of its obligation to pay wages for work already performed." *Id.* "ATS's actions were without legal or other justification and were an example of unscrupulous business dealings" and "[a]s a result of ATS's actions, Plaintiff was damaged in an amount equal to the wages and other benefits [plaintiffs are] owed for services already performed, as well as an amount of wages going forward that [they were] unable to earn because of Aeroframe's closure." *Id.*

So, unpacking the attempts at legalese, plaintiff-employees seek to make ATS responsible for the wages that Aeroframe did not pay for services that they (plaintiff-employees) performed for Aeroframe while employed by Aeroframe. Perhaps if ATS had stolen funds from the Aeroframe account that then precluded Aeroframe from paying its employees' wages, there might be a claim of some sort against ATS. But this is not that.

The obligation to pay the employees of Aeroframe wages owed for services already performed belonged to Aeroframe and Aeroframe only. Plaintiff-employees fail to allege any law

or set of circumstances that would obligate ATS to pay those wages and nothing in their response to the Motion for Summary Judgment points us to any such obligation.[39]

The only framework we can find into which might fit the plaintiff-employees' claims against ATS for "wages going forward" would be through some application of the theory of tortious interference with contract.

In *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La. 1989), "the Louisiana Supreme Court recognized a very narrow cause of action for tortious interference with contracts." *Am. Waste & Pollution Control Co. v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991). Finding no case on point but making an *Erie* guess and in keeping with the expressed intention of Louisiana courts to limit application of this cause of action,[40] the Eastern District of Louisiana determined that Louisiana law does not permit a cause of action for tortious interference with a contract against anyone other than an officer of a corporation. *Hibernial Cmty. Dev, Corp., Inc., v. U.S.E. Cmty. Servs. Grp., Inc.,* 166 F.Supp.2d 511, 514 (E.D.La. 2001). District judges in all district courts in Louisiana have similarly held[41] as has the Fifth Circuit Court of Appeal. The Fifth Circuit has noted:

> The *9 to 5 Fashions* Court specifically recognized only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person and disavowed any intention to adopt whole and undigested the fully expanded common law doctrine of interference with contract.

*Huffmaster v. Exxon Co.*, 170 F.3d 499, 504 (5th Cir. 1999). Insofar as no officer of ATS is a defendant to this claim, this claim must fail.

---

[39] The opposition filed by plaintiff-employees is devoid of any substantive facts supported by any kind of evidence, much less evidence that is appropriate for summary judgment consideration, refuting facts established by ATS through exhibits attached to its motion.

[40] *Great Southwest Fire Ins. Co. v. CAN Ins. Companies*, 557 So.2d 966, 969 (La. 1997)

[41] See, for example, *Roy Supply Co., Inc. v. Capital One Fin. Corp.*, No. 16-11349, 2016 WL 4362156 (E.D. La. Aug. 16, 2016); *Int'l Env't Servs., Inc. v. Maxum Indus., LLC*, No. 14-601, 2014 WL 4629662 (W.D. La. Sep. 15, 2014); and *Beta Tech., Inc. v. State Indus. Prods. Corp.*, No. 06-735, 2008 WL 11351462 (M.D. La. Sep. 24, 2008).

Even if an officer had been named, summary judgment against plaintiff-employees would still be in order. As set forth in *9 to 5 Fashions*, the elements of the cause of action for intentional interference with contracts are:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*9 to 5 Fashions*, 538 So.2d at 234. Pretermitting any discussion as to whether plaintiff-employees had any "contract" or "legally protected interest" with Aeroframe,[42] plaintiff-employees have wholly failed to allege or prove with summary judgment type evidence that any ATS corporate officer knew of the alleged contract or protected interest, that any such corporate officer intentionally induced Aeroframe to breach any contract with plaintiff-employees or intentionally made such performance impossible or more burdensome, that any ATS corporate officer acted without justification, or that any plaintiff-employee caused damage to any other plaintiff-employee because of a breach of contract or difficulty of its performance brought about by an ATS corporate officer.

Plaintiff-employees' only allegations suggesting that ATS did anything inappropriate were those implying that ATS used confidential financial information to purchase the EADS debt and subsequently foreclose on the debt which, according to plaintiffs (and Aeroframe and Porter as well), would force closure of Aeroframe. Doc. 92, att. 3, p. 4. Plaintiff-employees allege under

---

[42] Plaintiff-employees mention a contract of employment with Aeroframe in their pleadings but there has been no contract produced by any of them nor have they provided any facts or evidence that would suggest one did. Absent a written contract that binds the parties to a certain period of employment, the Louisiana Civil Code provides a default rule of employment-at-will. *Read v. Wilwoods Cmty.*, 165 So.3d 883, 887 (La. 2015). Louisiana law does not recognize a cause of action for tortious interference with at-will employment. *Favrot v. Favrot*, 68 So.3d 1099, 1111 (La. App. 4th Cir. 2011).

La. C.C. art. 2315 that Aeroframe's actions were retaliatory. The complaint's allegations under their LUTPA claim explain that this retaliation was occasioned by Aeroframe entering an agreement with AAR instead of ATS.[43] In short, these allegations suggest ATS was a very sore loser that chose to spend over $1M to mess up Aeroframe's good deal with AAR and therefore is liable to plaintiff-employees.

Plaintiffs produced not a single bit of evidence to refute the submissions of ATS.[44] Their Statement of Contested Facts consists of one page, the first paragraph of which complains they have not been able to conduct discovery in response to the motion, but neither have they sought relief under Rule 56(d) of the Federal Rules of Civil Procedure.[45]  Doc. 96, att. 1. They further

---

[43] Although not alleged in plaintiff-employees' complaints, all did not turn out well for Porter in his dealings with AAR. As we see II.C., particularly ¶ 34, however, the failure of Porter to succeed with AAR or ATS had everything to do with his own attempts at improving his own position—in total ignorance of the rights of the employees to be paid for their labor—and his deception in dealing with both ATS and AAR.

[44] Admittedly it might be difficult for plaintiff-employees, or anyone else truly representing their interests as opposed to the interests of Porter, to know where to go to get evidence. Brown got the information she used to prepare the complaints from her partner Filo, who got it from Porter (whom she also represented later). Doc. 54 (transcript of testimony taking at hearing on Motion for Sanctions in *Ashford 1*), p. 12 (transcript p. 171). It would not be difficult for Brown to get information from Porter (insofar as he is her client) but she would be hard-pressed to ascribe weight to any information provided by Porter as she has previously cast aspersions on his credibility. We mentioned previously the Motion for Summary Judgment filed by Ashford against Aeroframe in *Ashford 1* [14-cv-992, Doc. 85] and we will discuss it again following in the portion of this Report and Recommendation where we recommend the district court reconsider its previous ruling and grant the motion allowing Ashford to obtain judgment against Aeroframe for his unpaid wages, penalties, and attorney fees. In Ashford's reply to Aeroframe's objection to his request for summary judgment, Brown (who again was representing Porter at that point although at that time in the litigation no one knew that except Filo, Brown, Haik, and Porter) argued "Roger Porter's self-serving affidavit, which attempts to place sole fault for Plaintiff's losses on ATS, should be disregarded." 14-cv-992, Doc. 93, p. 1. This shadow boxing between Brown and her client Porter proves well what a sham this entire proceeding has been.

[45] In response to the Motion for Summary Judgment filed by ATS in *Ashford 1*—discussed in part in the preceding footnote—Brown (for Ashford) requested a continuance of deadlines to respond, claiming ATS's motion was based on pleadings and discovery from the Tennessee litigation to which Ashford was not a party. Brown (for Ashford) complained of being unable to have access to information related to AAR and its involvement in this melee. See 14-cv-992, doc. 113. ATS opposed the motion, noting there (as it does here) that Brown (for Ashford) failed to comply with F.R.C.P. art. 56(d). It also noted, however, that Ashford's claim to be a stranger to the Tennessee litigation was nonsensical given the fact it was Porter who filed that suit and Porter was aligned with Ashford. 14-cv-992, doc. 119, p. 10. The district court agreed with ATS's assessment, considered it a delay tactic, and denied the request. *Id.* doc. 126. The district court's conclusion on alignment was reversed by the Fifth Circuit (*Ashford v. Aeroframe Services, LLC*, 907 F.3d 385 (5th Cir. 2018)) but evidence discovered by ATS since the Fifth Circuit's decision which led to our conclusion here that we do enjoy subject matter jurisdiction as well as our issuing sanctions against Brown, Filo, Aeroframe, and Porter in *Ashford 1* shows just how ridiculous is the position that plaintiffs herein have been unable to conduct discovery relative to the present motion.. As we have now learned, Brown represents Porter as well as Ashford and all other plaintiff-employees. *See* the June 4, 2014, Cox-Porter Retention Agreement, doc. 46, att. 44, listing Brown as co-counsel with Filo for Porter.

state that "the factual timeline relied upon by ATS is not the relevant timeline" but present no evidence indicating how ATS's timeline is inaccurate or what would be the relevant timeline. *Id.* In their memorandum in opposition, plaintiff-employees argue that events uncovered in the Tennessee litigation[46] do not preclude a determination that ATS acted inappropriately. Doc. 96, pp. 2-3. The only Tennessee information that we find material to this consideration, however, is the August 10, 2013, AAR intraoffice email explaining why it would not hire Porter for management at the Lake Charles facility. This evidence negates the allegations of the employee-plaintiffs that ATS caused a complete disruption of the deal between Aeroframe and AAR. Plaintiff-employees "set forth [no] specific facts showing that there is a genuine issue for trial." *Anderson,* 106 S. Ct. at 2511. If they need additional information as to AAR's reasons for not going forward with Porter then they could have their lawyer, Brown, ask her other client, Porter, as that was the very issue in Porter's Tennessee suit against AAR. Or they could read the Tennessee transcript themselves. But they have either done none of this or found nothing helpful to their cause from those proceedings.

Plaintiff-employees allege that the deal between Aeroframe and AAR was intended to benefit them. Doc. 92, att. 3, p. 3, ¶ 10. They produce nothing to support that claim. They allege ATS "intentionally interfered" with the agreement between AAR and Aeroframe but they produce no evidence to support what ATS's intention was when it acted or even that ATS's activities interfered with AAR's plans. *Id.* at ¶ 11. What the outline above at II.C. clearly shows—an outline that plaintiff-employees have failed to controvert—is that AAR's ultimate goal was to acquire Aeroframe's assets, which included Aeroframe's lease with CIAA. AAR continued with its plans even after it knew ATS acquired the EADS note secured by the Aeroframe assets, so there was no

---

[46] See discussion at fn 36.

interruption in AAR's plans.  The EADS note was commercial paper that anyone could have acquired if they wished; ATS did not need access to Aeroframe information to know about the existence of the note.  Moreover, no document produced shows that ATS ever agreed to refrain from acquiring the note without Aeroframe or Porter's permission. Plaintiff-employees have produced no evidence to support their claim that ATS foreclosed on the EADS note and seized the assets with the intention of causing Aeroframe to go out of business.  According to the information provided by ATS, it foreclosed on the loan and seized the assets because AAR (whom Porter assisted in securing the CIAA lease) demanded the property be removed.  ATS could not remove the assets unless it had title. It used the Strict Foreclosure process to obtain title.  From the texts between Porter and Burnside set forth above, Porter not only knew ATS was engaging in this process but was also was assisting, including having his attorneys review the documents. Plaintiff-employees have produced no evidence to controvert those facts and no evidence to support their claim that actions of ATS caused the closure of Aeroframe.  ATS is not obligated to prove why Aeroframe closed; rather, plaintiff-employees are required to produce evidence to support their allegation that Aeroframe closed because of ATS's actions. Plaintiff-employees have failed to do so and as such, have failed to establish a genuine issue of material fact.

We recommend that all claims of the plaintiff-employees against ATS for damages for intentional interference with the contract between Aeroframe and AAR and plaintiff-employees' (non-existent) employment contract with Aeroframe be dismissed with prejudice.

### c. Claims for Damages under Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. § 41:1401 *et. seq*.

LUTPA proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). "Because of the broad sweep of this language, 'Louisiana courts determine what is a LUTPA violation on a case-by-case

basis.'" *Quality Env't Processes, Inc. v. Petroleum Co., Inc.*, 144 So.3d 1011, 1025 (La. 2014). To establish a LUTPA claim, a plaintiff "must show that 'the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'" *Id.* The Louisiana Supreme Court has held that the "range of prohibited acts under LUTPA is extremely narrow" because the statute prohibits "only fraud, misrepresentation, and similar conduct, and not mere negligence." *Id.* A critical factor in determining whether conduct was unfair or deceptive under LUTPA is the "motivation and intent" of the defendant. See *Pikaluk v. Horseshoe Entm't, L.P.*, 810 F. App'x 243, 250 (5th Cir. 2020) (quoting *Iberia Bank v. Broussard*, 907 F.3d 826, 840 (5th Cir. 2018)).

Courts are reluctant to find liability under LUTPA when the evidence reveals a normal business relationship. See *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994). LUTPA does not prohibit businesses from exercising permissible business judgment or engaging in appropriate free enterprise transactions. See *Turner v. Purina Mills*, 989 F.2d 1419, 1422 (5th Cir. 1993). "The statute does not forbid a business to do what everyone knows a business must do: make money." *Id.* Indeed, even "conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA." *Quality*, 144 So.3d at 1025. As stated by the district court when considering ATS's Motion for Summary Judgment against all non-ATS litigants in *Ashford 1,* "[t]o state a viable claim under LUTPA, the plaintiff-employee must establish he suffered an ascertainable loss that was caused by ATS's use of unfair or deceptive acts or practices." 14-cv-992, doc. 131, p. 21.

Once again, plaintiff-employees' Statement of Contested Facts is silent as to any fact that might be tried to a jury for a claim under LUTPA. Doc. 96, att. 1. Their memorandum in opposition to the motion points to no facts that pertain specifically to the LUTPA claim. They

argue in their memorandum that ATS's motion "completely ignores ATS's role in Aeroframe being effectively forced into the decision of having to close its doors" [doc. 96, p. 2] but provides no evidence of what the role was or whether its actions constitute an unfair or deceptive act or practice. The memorandum complains that ATS exploited information by purchasing the EADS note and threatening foreclosure. *Id.* While the word "exploited" makes ATS sound really mean, that does not constitute a violation of LUTPA. Given the evidence submitted by ATS with its motion, we find that nothing it did in its relationship with Porter or Aeroframe would offend public policy or was "immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Quality,* 144 So.3d at 1025. Plaintiff-employees have produced no evidence of ATS's intent or even circumstantial evidence that could lead a reasonable juror to conclude it acted with malintent.

We noted in the section above that there was nothing that prohibited ATS from purchasing the EADS note, a commercial instrument. Additionally, we noted that the "foreclosure" about which plaintiff-employees complain was actually an agreement to transfer title to the assets securing the loan when AAR, who had acquired the CIAA lease with Porter's assistance, demanded that the assets be moved. If there was any fraud, deceit, or misrepresentation it was by Porter, not by ATS.

We recommend that all claims of the plaintiff-employees against ATS for damages under the Louisiana Unfair Trade Practices Act be dismissed with prejudice.

**2. Claims of Aeroframe**

In opposition to ATS's motion, Aeroframe merely attached its response to the motion filed by ATS in *Ashford 1*. In footnote 1 to its opposition it claims to

> adopt[] and incorporate[] in its (sic) entirety its Memorandum in Support of Motion to Remand (Doc 10) including exhibits, its Reply Memorandum in Support of its Motion Remand (Doc. 22) and its Objection to Report and Recommendation on Motion to Remand (Doc 65) and pleads each and all

of the arguments advanced in those prior pleadings which adequately outline the lack of this Court's subject matter jurisdiction.

Doc. 98, p. 2, fn 1.  Just as we did with plaintiff-employees' similar attempt to incorporate other pleadings by reference, we decline this invitation to deconstruct those pleadings to assist Aeroframe in defeating ATS's motion.

Also, we obtain no understanding of any issue of fact by relying upon the Statement of Material Facts that Aeroframe produced in *Ashford 1*.  ATS filed a new Statement of Uncontested Material Facts in this litigation. Doc. 92, att. 48.  So, for example, when Aeroframe states in paragraph 2 of its Statement of Material Facts that it contests ATS's "#5," the remainder of the answer does not reflect anything having to do with ATS's fact #5 in this case.  See Doc. 98, att. 1, p. 1.  We will not waste any more of our time by attempting to ascertain to which fact Aeroframe attempts to create an issue.

We need not refer to the particular claims of Aeroframe against ATS as Aeroframe waived any right it might have had when it signed the Strict Foreclosure Agreement.  The pertinent portions of the agreement are quoted above and we reproduce them here:

> Effective upon the date hereof, Aeroframe hereby (a) irrevocably and unconditionally releases and forever discharges ATS . . . from any and all rights, claims, remedies and causes of action related to the Note, Security Agreement and Note Purchase Agreement, and the transfer of the Transferred Collateral under this Agreement . . . and (b) covenants not to sue . . . on account of any Released Claims.
>
> . . .
>
> This agreement has been jointly drafted by ATS and Aeroframe and both parties have had access to and the opportunity to consult with independent legal counsel.  This Agreement shall not be construed in favor or against any party based on draftsmanship.  Both of the Parties acknowledge having read all of the terms of this Agreement and they enter into the Agreement voluntarily and without duress.

Doc. 92, att. 17, pp. 6-7, 8, ¶¶ 8, 17.  Aeroframe states in paragraph 17 of its Statement of Material

Facts:

> Aeroframe contends that when Porter signed the "Strict Foreclosure Agreement" it was based on ATS' vastly superior bargaining strength and Roger Porter's fear of economic deprivation[47] which combined to vitiate consent and the Release was not valid as it was not a bargained for agreement due to lack of mutual consent.

Doc. 98, att. 1, p. 3.  In paragraph 18 it states:

> Aeroframe contends the "Waiver/Release of Claims by Aeroframe" it was based on ATS' vastly superior bargaining strength and Roger Porter's fear of economic deprivation which combined to vitiate consent and the Release was not valid as it was not a bargained for agreement due to lack of mutual consent.

*Id.*  Aeroframe provided no summary judgment type evidence—such as an affidavit from Porter—

to substantiate these allegations.  When disposing of this issue in *Ashford 1* the district court noted:

> Under Louisiana law, contracts have the effect of law between the parties and can only be cancelled "through the consent of the parties or on grounds provided by law."  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." The strict foreclosure agreement contains a clause in which Aeroframe agreed to "irrevocably and unconditionally release[] and forever discharge[] ATS... from any and all rights, claims, remedies, and causes of action relating to the Note, Security Agreement, and Note Purchase Agreement, and the transfer of the Transferred Collateral under this Agreement." Under the clear meaning of this clause, Aeroframe has waived all claims that arise out of the purchase of or foreclosure on the EADS note. Aeroframe does not contest that this waiver covers all of the claims it has brought against ATS.  Rather, Aeroframe argues that the waiver has no effect because the strict foreclosure agreement was signed under economic duress.
>
> Duress is an affirmative defense under Louisiana law and as such, must be affirmatively pleaded under both the Louisiana Rules of Civil Procedure and the Federal Rules of Civil Procedure.  "When an

---

[47] Aeroframe fails to explain why Porter would be under any fear of economic deprivation.  Porter had already signed his employment agreement with AAR when the Strict Foreclosure agreement was signed.  As we have concluded previously, that agreement was signed so that ATS could obtain legal title to the equipment so that it could lawfully remove the equipment from the CIAA hangar leased by AAR—a lease it obtained with the assistance of Porter.

> affirmative defense is not included in the answer, evidence can be adduced thereon only in the absence of an objection." Aeroframe did not raise the affirmative defense of duress in its pleadings. Because ATS has objected to Aeroframe's affirmative defense, evidence of duress is not properly before the court on a motion for summary judgment. Aeroframe has not moved to amend its pleadings, but if it did so under Rule 15(a)(2) of the Federal Rules of Civil Procedure, the court would grant the request freely if justice so required.

14-cv-992, doc. 131, pp. 26-27 (footnotes omitted).  In the nearly four years since that opinion was issued, Aeroframe still yet to amend its answer to raise these affirmative defenses.  In its reply to Aeroframe's opposition to the Motion for Summary Judgment, ATS again raises the issue of Aeroframe's failure to affirmatively plead duress.  Doc. 101.

We see no reason to conclude differently than did the district court and recommend that the claims of Aeroframe against ATS be dismissed with prejudice as being barred by the Strict Foreclosure Agreement.  Accordingly, we see no reason to examine the particular causes of action raised by Aeroframe, i.e. breach of contract, tortious interference with business relations, intentional interference with business relations, or LUTPA.

### 3.  Claims of Porter

Porter and Aeroframe cheated off each other's pleadings.  Just exactly as did Aeroframe, Porter states in footnote 1 to his opposition that he

> adopts and incorporates in its (sic) entirety his Memorandum in Support of Second Motion to Remand . . . (Doc. 7-1), his Reply Memorandum in Support of Second Remand (Doc. 21) and his Objection to Report and Recommendation on Motion to Remand (Doc. 63) and pleads each and all of the arguments advanced in those prior pleadings which adequately outline the lack of this Court's subject matter jurisdiction.

Doc. 97, p. 2, fn 1.  Just as we did with plaintiff-employees' and Aeroframe's similar attempts to incorporate other pleadings by reference, we decline this invitation to analyze those pleadings to

assist Porter in defeating ATS's motion.  Porter also resubmitted the Declaration he filed in *Ashford 1* dated March 27, 2017.  Doc. 97, att. 4.

And just as did Aeroframe, Porter simply relies upon the Statement of Material Facts and Contested Facts that it produced in *Ashford 1*.  See Doc. 97, atts. 2, 3.  Just as with Aeroframe's statement, the paragraph numbers to which Porter attempts to respond are incorrect—ATS filed a new Statement of Uncontested Material Facts in this litigation.  Doc. 92, att. 48.  We will not waste any more of our time by attempting to ascertain to which fact Porter attempts to create an issue.

Porter gives a factual backdrop similar to that provided by plaintiff-employees (which would make sense given the fact that Brown got her information for the plaintiff-employee claims from Filo who represented Porter) but adds a bit of meat to the bare-boned allegations of the others.  Porter mentions: (1) the June 7, 2013, 30 day exclusivity agreement with ATS; (2) the fact that he did not reach an agreement with ATS; (3) that thereafter he (Porter) was in contact with AAR; (4) that he confirmed with ATS on July 21, 2013, that he and Aeroframe were considering another offer "and could not consider an ATS offer;"[48] (5) that ATS, "relying exclusively on confidential information provided to ATS by Aeroframe and . . . Porter," agreed to buy the EADS note; (6) that ATS failed to inform him that it was purchasing the note "with the intent to foreclose on Aeroframe;" and (7) that ATS did buy the note, intending for it to "completely disrupt[] the ability of Aeroframe, Roger A. Porter and AAR to complete their purchase and employment agreement."  Doc. 1, att. 12, pp. 106-108.

---

[48] Interesting he would allege this when, just 10 days later, he signed an employment agreement with ATS, having been in negotiations with them the entire time.  See II.C.18.  Porter's declaration does not attest to his allegation that he told ATS he "could not consider" an ATS offer but, even if it did, that would create no material issue of fact triable to a jury.  See Doc. 97, att. 4 (Porter Declaration).  But this does not weigh in favor of lending credibility to Porter, not that credibility is a consideration here.

### a. Intentional or Tortious Interference with Porter's Employment Contract with AAR and/or his Business Relationship with AAR

While Porter alleges intentional or tortious interference with a contract and/or business relationship under a single heading in his demand against ATS [*Id.* at p. 108] we analyze his allegations as two separate claims governed by different legal standards.

### i. Intentional or Tortious Interference with Porter's Employment Contract with AAR

Porter claims that the actions of ATS recited above interfered with his employment agreement with AAR, thereby rendering ATS liable to him for an amount "equal to all compensation and benefits he stood to receive from his employment contract with AAR." Doc. 1, att. 12, p. 108. Porter's affidavit does attest to the facts alleged but it omits one very salient fact, i.e. that Porter sued AAR in Tennessee for breach of the employment agreement he executed with them on 8/1/13. *See generally* doc. 97, att. 4. How could ATS have interfered with a contract that actually existed and was the subject of this separate litigation? That is a rhetorical question.

Porter's claim for tortious interference with a contract fails for the same reason we suggest dismissal of the plaintiff-employees' tortious interference with a contract claim: Porter has not sued an officer of ATS. Likewise, Porter can satisfy no other elements of the cause of action for intentional interference with a contract, which we set forth above in our analysis of the plaintiff-employees' interference with contract claims. See *supra* Part II.D.1.b; *9 to 5 Fashions*, 538 So.2d at 234. While Porter had a contract with AAR—satisfying the first element—there is zero evidence that ATS was aware of its existence and there is zero evidence that anyone with ATS had anything to do with AAR's breach or the rendition of AAR's performance "impossible or more burdensome." *Id.* Since there is no evidence that ATS had anything at all to do with the contract between Porter and AAR, we need not analyze the element inquiring whether there was an "absence of justification" for ATS's action. *Id.*

We recommend that all claims of Porter against ATS for damages for intentional or tortious interference with a contract be dismissed with prejudice.

### ii. Intentional or Tortious Interference with Porter's Business Relationship with AAR

"Louisiana courts have long recognized a cause of action for tortious interference with business." *Restivo v. Hanger Prosthetics & Orthotics, Inc.,* 483 F.Supp.2d 521, 537 (E.D. La.2007), citing *Junior Money Bags, Ltd. v. Segal,* 970 F.2d 1 (5th Cir.1992), citing *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594 (5th Cir. 1981), citing *Graham v. St. Charles St. R.R. Co.,* 47 La. Ann. 1656, 18 So. 707 (1895) "[T]he plaintiff in a tortious interference with business suit must show by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff." *Junior Money Bags,* 970 F.2d at 10.

Porter does not set forth any facts showing that AAR and ATS had any sort of contact that could be described as ATS influencing AAR to do anything vis-à-vis Porter. The evidence provided by ATS shows that Porter acted as the conduit of information between the two.[49]

Why the relationship between Porter and AAR faltered is not a material fact in the summary judgment inquiry for tortious interference with business. What would be material would be any evidence, other than Porter's unsupported conclusion,[50] that ATS improperly influenced AAR to

---

[49] See, for example, II.C.28 above where Porter emails ATS COO on 8/4/2013 pretending to have just then been advised that AAR had secured the CIAA lease and further advising that AAR wanted him, Porter, to "move all Aeroframe assets over the next two weeks". See also II.C.29 where Porter informs the ATS COO that "AAR has requested you to not to come to the facility."

[50] "Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am.'s Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir. 1997). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)). Rather, the nonmovant must offer "significant probative evidence" to establish a genuine issue for trial. See *Anderson v. Liberty Lobby, Inc.,* 106 S. Ct. 2505, 2510 (1986). Porter's affidavit states that ATS's purchase of the EADS note "succeeded in scuttling the AAR acquisition." Doc. 97, att. 4, p. 3, ¶ 24. He also asserts that Aeroframe closed "due to lack of funds to pay payroll and other outstanding payables as well as the imminent foreclosure of the equipment by ATS." *Id.,* p. 4, ¶ 32. Even adhering to our charge to draw all inferences in favor of Porter, the nonmovant, we find that this affidavit simply does not create a genuine issue for trial. Porter's subjective opinion about ATS's role in causing the foregoing events—a

not deal with Porter.  Though not necessary to be granted summary judgment on this point, ATS did produce the intraoffice communication from AAR that described precisely AAR's problem in conducting business with Porter: he failed to pay his employees. See II.C.34. Porter, however, fails to produce a single document that would support his plain statement that ATS was in any manner responsible for the failure of his relationship with AAR.  Rather, Porter's affidavit shows that AAR did offer him employment even after ATS purchased the EADS note secured by Aeroframe's assets. Doc. 97, att. 4, pp. 3-4.

We recommend that all claims of Porter against ATS for damages for intentional or tortious interference with a business relationship be dismissed with prejudice.

### b.  LUTPA

Porter alleges that ATS

> intentionally exploited confidential financial information obtained from Roger A. Porter and Aeroframe, made intentional misrepresentations to Roger A. Porter and Aeroframe and utilized the ill gotten information to interfere with and disrupt a legitimate business transaction between AAR and Aeroframe and Roger A. Porter.  ATS's action constitutes an unfair method of competition and an unfair practice in the conduct of ATS's trade.

Doc. 1, att. 12, p. 109.  As we have already concluded above, existence of the EADS note was not confidential, no document anywhere required ATS to obtain permission from Aeroframe or Porter to purchase that commercial instrument, and AAR went forward with its dealings with Porter even after it knew ATS had purchased the EADS note.  Porter has produced no evidence of any action taken by ATS that would offend public policy or that was "immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Quality*, 144 So.3d at 1025.  Porter has produced no

---

conclusion otherwise devoid of any factual support—is insufficient to establish a genuine issue of fact as to whether ATS improperly influenced AAR to not deal with Porter.

evidence of ATS's intent or even circumstantial evidence that could lead a reasonable juror to conclude it acted with malintent.

We recommend that all claims of the plaintiff-employees against ATS for damages under the Louisiana Unfair Trade Practices Act be dismissed with prejudice.

### III.
### ATS'S INVITATION TO DISMISS PLAINTIFF-EMPLOYEES' CLAIMS AGAINST AEROFRAME PURSUANT TO RULE 56(f)

In its Motion for Summary Judgment, ATS invites us to dismiss the plaintiff-employees' wage claims against Aeroframe given the content of the conflict waiver and agreement between the plaintiff-employees, Aeroframe, and Porter. Doc. 92, p. 6. It argues somewhat appropriately (but without regard to its own claims against Aeroframe and Porter) that, "[a]fter dismissal of all claims against ATS, the only claims remaining are the claims of the Aeroframe-Employees against Aeroframe under the Last Paycheck Law." Doc. 92, att. 1, 43. What is not clear is why ATS is concerned about the claims between the plaintiff-employees and Aeroframe, claims in which they are uninvolved.

In Section IV below we are recommending that the district court reconsider its previous mooting of Ashford's Motion for Summary Judgment in *Ashford 1*. On February 22, 2021, we ordered the plaintiffs in the original member case of *Cooley, et al v. Aeroframe Services, LLC, et al*, docket number 14-cv-987, to file motions for summary judgment against Aeroframe for their wages, penalties, and attorney fees, or risk recommendation that their claims be dismissed for failure to prosecute them. Doc. 104. On that same date we had the Clerk of Court issue Notice of Intent to Dismiss Aeroframe in the remaining cases either for failure to take a default (in those cases where no answer had been filed by Aeroframe) or for failure to serve.[51] By so doing we are

---

[51] See docs. 102, 103. See also discussion at fn. 11. Aeroframe and Porter wanted to go forward with *Ashford 1* so Aeroframe filed an answer to Porter's claim for wages. Aeroframe also answered the claims of the plaintiff-employees

exercising our inherent power to take action "on [our] own initiative, to clear [our] calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R. Co.*, 82 S.Ct. 1386, 1389 (1962).

In our Report and Recommendation issued with respect to sanctions in *Ashford 1*, we said:

> On more than one occasion in open court we have asked, somewhat rhetorically, "who is representing Mr. Ashford?" It appears very clear that the answer is "no one." It is apparent that the only client about whom the Cox firm was concerned was Porter.

14-cv-992 (*Ashford 1*), doc. 283, p. 33 (Report and Recommendation adopted by the district court at doc. 294). We noted that Brown, on Ashford's behalf, did file a Motion for Summary Judgment for his wages, penalties, and attorney fees[52] but that it was done "not to get [Ashford's] claim fixed but rather was an attempt to get around our ruling on jurisdiction." *Id.* We asked there:

> If Brown were truly representing Ashford, why would she not have had her client Porter include [in the declaration made by Porter and used by Aeroframe to "defend" against the claim] that the figures given by Ashford were correct? The answer is because she did not care about Ashford's claim; she only cared about Porter's bigger claim against ATS which he wanted handled in state court.

*Id.* Also:

> Brown also never investigated the extent to which Porter may have some culpability in Ashford's damages by either considering whether he improperly removed funds from the business (as was alleged in every other case for wages brought by former employees who were represented by attorneys other than the Cox firm) or his failure to pursue receivables allegedly owed to Aeroframe that were the [as per Porter] cause of its closure . . . .

*Id.* at pp. 33-34. And finally:

---

in *Cooley* as it and Porter moved forward in that suit first. See fn. 13. In all other cases consolidated either Aeroframe did not bother to answer the plaintiff-employees claim for wages (thus were subject to dismissal for plaintiffs' failure to default) or the plaintiff-employees did not even bother to serve Aeroframe (thus were subject to dismissal for plaintiffs' failure to serve.) Remarkably (or not), the plaintiff-employees needed lift no finger to remedy their lapses in prosecution—Aeroframe just voluntarily answered each of the claims to keep them alive. Doc. 105. That is what litigants do when they are on the same team!

[52] Discussed in Section IV below.

> [T]he record supports the inference that, although this suit was technically brought by Ashford, this entire litigation was pursued for Porter's (and Aeroframe's) benefit in coordination with Brown and Filo . . . . Ashford has been simply the vehicle, driven by Porter with the assistance of Brown and Filo, to keep this conflict with ATS in the forum for which Porter shopped.

*Id.* at p. 35. The same is true for all of the plaintiff-employees. No one in this litigation has been truly interested in their claims against Aeroframe. If anyone in this litigation had been truly interested in the claims of the plaintiff-employees against Aeroframe, they would have been resolved long ago.[53] Insofar as no attorney in this litigation has been or is currently concerned about the welfare of the plaintiff-employees, we recommend taking care of the matter differently.

While our inherent authority to "clear [our] calendars of cases" [*Link, supra*] would include the authority to dismiss the claims of the plaintiff-employees, we believe we are accomplishing this goal in a more appropriate procedural manner, one that is more fair to the plaintiff-employees who all have been the unwitting pawns of Brown, Filo, Porter alter-ego Aeroframe, and Porter. Therefore, we recommend the court deny ATS's request for summary judgment in favor of Aeroframe on the plaintiff-employee's wage claims.

## IV.
### RECOMMENDATION TO RECONSIDER DISTRICT COURT'S PREVIOUS RULING ON ASHFORD'S MOTION FOR SUMMARY JUDGMENT IN *ASHFORD 1*

As we note above and in *Ashford 1*, plaintiff-employee Ashford filed a Motion for Summary Judgment for his wages, penalties, and attorney fees against Aeroframe. The legal basis for his claim is the Louisiana "Last Paycheck Law." 14-cv-992, doc. 85. Ashford argued that he

---

[53] In fn. 8 of the Report and Recommendation on sanctions found at 14-cv-992 (*Ashford 1*), doc. 283, p. 10, we note that "*Valentine v. Aeroframe Services, LLC, et. al,* 2013 WL 10835400 (La. Dist. Ct. 14th 9/17/2013) was a lawsuit brought in state court by an Aeroframe employee against the company and Porter. All parties were represented by counsel not involved in this litigation. A consent judgment was entered in that matter in favor of Valentine against Aeroframe for Valentine's wages, ***penalties***, and attorney fees. 2014 WL 10077424 (La. Dist. Ct. 14th 9/25/2014)." All plaintiff-employee claims against Aeroframe could have been similarly resolved in 2014 had there been a real interest in resolution.

was employed by Aeroframe and "was terminated without warning" on August 9, 2013 and, as of his termination, he had worked two weeks for which he had not yet been paid. *Id.*, att. 1, p. 1. Having received no payment 15 days after his termination and having served a written demand upon Aeroframe that went unanswered, Ashford sought his wages, penalties and attorney fees pursuant to <u>Louisiana Revised Statute 23:631</u>, *et. seq. Id.*, pp. 1-2. In its opposition, Aeroframe argued that (1) ATS's actions were the "sole reason" why Aeroframe was unable to pay its former employees; (2) a good faith exception to the statutory penalties applied; and (3) Ashford had not met his initial burden of proof showing his entitlement of attorney's fees. *Id.* at <u>doc. 90</u>.

The district court denied Ashford's motion as moot, finding that "any claims among Ashford, Aeroframe and Porter" had already been resolved. *Id.* at <u>doc. 104, p. 2</u>. The court referred to its previous ruling on a Motion to Remand which found that the parties were aligned. *Id.*, p. 4. The court noted that Ashford signed a conflict waiver that would allow the Cox Firm to represent both Ashford and Porter in the same litigation. *Id.*, p. 2. Additionally, the court referenced the infamous email from Brown explaining the waiver, which "affirmatively stated that Aeroframe would not defend against the wage claims."[54] *Id.* It found Aeroframe's "opposition" to be "better read as a confirmation of [the agreement proposed by the Brown email] than an actual opposition to the motion." *Id.*, p. 3. The district court concluded that Ashford's motion for summary judgment was merely an attempt to re-litigate the issue of subject matter jurisdiction, and therefore dismissed the motion as moot. *Id.*, p. 4.

"An order denying summary judgment is interlocutory, and leaves the trial court free to reconsider and reverse its decision for any reason it deems sufficient." *Baisden v. I'm Ready Prods., Inc.*, <u>693 F.3d 491, 506</u> (5th Cir. 2012) (citing *Zarnow v. City of Wichita Falls, Tex.*, <u>614</u>

---

[54] The email referenced is the Brown email at <u>doc. 46, att</u>. 40.

F.3d 161, 171 (5th Cir. 2010); *See* Fed. R. Civ. P. 54(b). Louisiana Revised Statutes § 23:631 *et. seq.*, collectively referred to as Louisiana's "Last Paycheck Law," require that upon an employee's discharge, the employer must pay "the amount due under the terms of employment … on or before the next pay regular payday or no later than fifteen days following the date of discharge, whichever occurs first." La. R.S. § 23:631(A)(1)(a). In order to recover pursuant to § 23:632—the penalty section of the statute—a plaintiff must prove that "(1) wages were due and owing; (2) demand for payment was made where the employee was customarily paid; and (3) the employer did not pay upon demand." *Clay Heath v. Workforce Grp. LLC*, No. 20-839, 2020 WL 4515210, at *2 (W.D. La. Aug. 5, 2020) (citing *Becht v. Morgan Building & Spas, Inc.*, 843 So.2d 1109, 1112 (La. 2003)). Here, the penalty for failure to comply with § 23:631 would be "ninety days wages at the employee's daily rate of pay." La. R.S. § 23:632(A). If the plaintiff brings a "well-founded" suit to recover unpaid wages, an award of reasonable attorney fees is mandatory. *Id.* at § 23:632(C). A suit is considered "well-founded" where the employee successfully recovers unpaid wages. *Taylor v. Washington Mut., Inc.*, No. 4-521, 2011 WL 98838, at *11 (W.D. La. Jan. 12, 2011).

Ashford's declaration set forth facts that warrant success on his wage claim against Aeroframe: he was an employee of Aeroframe upon its closure, and he did not get paid for his final two weeks of work within 15 days of his termination. Doc. 14-cv-992, doc. 85, att. 3. The declaration provided his rate of pay, translating to $2,640 in wages. *Id.* Ashford also submitted the Contract of Retainer showing he hired Brown to pursue his wage claim, which provided for attorney fees in the amount of one-third of the recovery. *Id.*, att. 4. We find that Ashford met his burden of setting forth specific facts and demonstrating the lack of a genuine issue for trial on his claims. See *Tubacex*, 45 F.3d at 954.

Aeroframe had the opportunity to oppose summary judgment—and did in fact file an opposition—but it failed to raise the existence of a genuine issue of material fact on these points. *Id*. at doc. 90. Aeroframe did not even attempt to dispute Ashford's general entitlement to wages or the amount thereof. *Id*. Aeroframe did not dispute that it failed to pay its former employees, but only blamed the failure on ATS. *Id*., pp. 2-3. Aeroframe's submitted declaration stated that it filed a reconventional demand against ATS for the "unfair methods of competition and unfair practices" that damaged Aeroframe. *Id*. at doc. 90, att. 1, p. 2. Moreover, Aeroframe declared that "at no time" did it arbitrarily or capriciously refuse to pay wages from company funds, but it was unable to pay only because of ATS's actions. *Id*. This argument does not create an issue of material fact on the prerequisites for recovery of unpaid wages. The *reason* for Aeroframe's failure to pay is not a material fact for the wage claim. The statute does not require a bad faith[55] or arbitrary denial of payment to afford relief to the claimant on unpaid wages, but only requires a failure to pay after 15 days have passed. La. R.S. § 23:631(A)(1)(a) and 23:632(A). Thus, Aeroframe failed to show a genuine issue for trial as to Ashford's entitlement to his wages.

Next, Ashford's sworn declaration attached to his motion for summary judgment claims ninety days wages in statutory penalties, which equates to $23,760. Doc. 85, att. 3. A demand for payment must be made upon the employer in order to receive penalties in addition to the ordinary unpaid wages. See *Clay Heath,* 2020 WL 4515210, at *2. Ashford's declaration does not claim that he made a demand for wages upon Aeroframe—only that he was "seeking" wages and penalties. Doc. 85, att. 3. In his memorandum in support, however, he points out the Louisiana Supreme Court's holding that when an employer files a general denial of liability to a plaintiff's

---

[55] We note that the good faith exception was added to the statute in August 2014—a year after facts giving rise to Ashford's wage claim occurred. La. R.S. § 23:632. *Compare* Enacted Legislation Acts 1977, No. 317, § 1 *with* Enacted Legislation Acts 2014, No. 750, § 1.

suit for unpaid wages, the employer waives any technical deficiencies in pre-suit demand. *Monroe Firefighters Ass'n v. City of Monroe*, 6-1092, 2009 WL 805132, at *7 (W.D. La. Mar. 25, 2009) (citing *Carriere v. Pee Wee's Equip. Co.*, 364 So. 2d 555, 557 (La. 1978)). Here, Ashford filed suit for his unpaid wages, and Aeroframe filed a general denial of liability for his wages. [56] Under these facts, the *Carriere* holding requires that "technical deficiencies … will not defeat the imposition of statutory penalties designed to enforce prompt payment." 364 So.2d at 557. We therefore find that there is no genuine issue of material fact as to whether Ashford is entitled to penalties under the statute as Aeroframe waived any deficiencies in the pre-suit demand. Moreover, more than ninety days have certainly elapsed since Ashford was terminated in August of 2013, so the amount of statutory penalties is not in dispute. La. R.S. § 23:632(A).

With respect to Ashford's request for attorney fees, Aeroframe only complained that Ashford failed to specifically show the amount of time Brown spent on his claims. Such evidence is unnecessary to show entitlement to attorney fees. *Id*. at doc. 90, p. 5. Since Ashford provided his contingency fee agreement with Brown, the amount of attorney fees is readily calculable—the court merely needs to divide the ultimate recovery by a third. *Id*. at doc. 85, att. 4. Here, Ashford has demonstrated his entitlement to an amount of $26,400, a third of which is $8,800. *Id*. at doc. 85, p. 2. As Ashford pointed out, this amount is quite reasonable for a case taken on a contingency basis with a relatively low amount in controversy. *Id*. at att. 1, p. 5. Since we recommend granting Ashford's motion as to his wages, then his suit is indeed "well-founded"and the award of attorney fees is mandatory. See *Taylor*, 2011 WL 98838, at *11 Thus, there is no genuine issue of material fact regarding an award of attorney fees.

---

[56] "Plaintiff was owed at least two-weeks wages'…. and, despite demand therefore, has not been paid for those two weeks…" Doc. 1, att. 12, p. 5, ¶ 5. Aeroframe denied these allegations. *Id*. at p. 116, ¶ 5.

Ashford set forth the specific facts demonstrating his entitlement to his unpaid wages, attorney fees and penalties, and Aeroframe has not been able to controvert those facts with competent summary judgment evidence. Notably, Aeroframe has not challenged whether Ashford was Aeroframe's employee or the amount he claims. Aeroframe only complained that ATS's actions were the reason Aeroframe failed to pay Ashford's wages. If the district court accepts our foregoing recommendation and dismisses all claims of the non-ATS litigants against ATS, there will remain no semblance of any genuine issue of material fact for trial save ATS's claims against Porter and ATS.[57]  With its demand against ATS dismissed, Aeroframe could no longer blame ATS for its failures.

The district court's initial finding of mootness of Ashford's request is understandable.  No doubt the court assumed that at some point non-Ashford counsel would relinquish the ruse that the non-Ashford parties were adverse and that Brown would follow through on the promises made to her clients in her email that Aeroframe counsel would stipulate to their "entitlement to wages, penalties, and attorney's fees . . . ." Doc. 46, att. 40, p. 3.[58]  It has been nearly seven years since this litigation began and counsel continues to perpetuate the scam for the sole benefit of Porter and themselves, undoubtedly with the hopes that they can again convince a higher court to believe we

---

[57] See discussion at Section I.C.

[58] No doubt that is what happened in the *Valentine* matter discussed at fn. 53.  Counsel for Porter and Aeroframe there (not any attorney in this litigation) stipulated to judgment in favor of the plaintiff-employee and against Aeroframe and Aeroframe alone for full wages, penalties, and attorney fees.  Porter was more than happy at that time to agree to judgment against Aeroframe – he knew Aeroframe was worth nothing and was able to avoid personal liability. *Valentine* was filed 9/13/13.  2013 WL 10835400.  *Cooley*, the first filed of these consolidated cases, was not filed until 9/24/13.  14-cv-987 (*Cooley*), doc. 1, att. 1, p. 1.  We easily envision Porter attempting to paint the scenario used in these proceedings for his *Valentine* counsel who refused to play that game.  Thus the need for Porter to seek out his old counsel, Filo, who had no difficulty ignoring Porter's mendacity and blazing forward with the assistance of his partner, Brown, taking the lead with the plaintiff-employees, starting the chain by only suing Aeroframe and ATS. For discussion of Porter's pre-suit conferencing with Filo, see Doc. 62 (R&R on the second removal of this case), doc. 62, p. 12.  Once ATS circled back to bring in Porter they thought they were safely entrenched in state court, ready to proceed with whichever of the many lawsuits filed where they felt most likely to prevail on the meritless claims.  And then ATS came into possession of the infamous Brown email which began the removal processes.

lack subject matter jurisdiction and return to their state court land of promise.  Ashford deserves to have at least a document validating his claim for wages, penalties, and attorney fees.

Assuming the court agrees this remedy is in order, this Report and Recommendation serves as notice of the court's intent to reconsider the interlocutory order in *Ashford 1* [14-cv-992 at doc. 104].[59] We recommend the court reconsider its previous ruling and grant Ashford's motion for summary judgment against Aeroframe as to his wages, attorney fees, and penalties.

## V.
### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that ATS's Motion for Summary Judgment [doc. 92] be **GRANTED** as to all claims against it. Further, we **RECOMMEND** the court **DENY** ATS's request to grant summary judgment in favor of Aeroframe against the plaintiff-employees. Finally, we **RECOMMEND** the court **RECONSIDER** its previous ruling in *Ashford 1* denying the Motion for Summary Judgment filed there by Michael Ashford against Aeroframe and that the motion be granted, and Ashford be awarded his wages, penalties, and attorney fees as prayed for against his former employer.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon

---

[59] Notably, the Fifth Circuit has approved of the *sua sponte* reconsideration of an interlocutory order and a request for additional briefing where one district court judge made the initial ruling, and another judge decided to revisit the issue after the case was reassigned to him. *See Harmon v. Dallas Cnty., Tex.*, 927 F.3d 884, 892 n. 14 (5th Cir. 2019).

grounds of plain error. *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428–20 (5th Cir. 1996), *superseded by statute on other grounds,* 28 U.S.C. § 636(b)(1)), *as recognized in Cruz v. Rodriguez,* 828 F. App'x 224, 2020 WL 6478502 (5th Cir. 2020) (unpubl.).

THUS DONE AND SIGNED in Chambers this 29th day of April, 2021.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE